BEFORE THE SECOND DIVISION, MARCH 8, 1956

**No. 59752.**—Ciba States, Ltd. *v.* United States, protest 208860–K (New York).

LAWRENCE, Judge:   An article described in the record as a "diaphragm valve" was classified as an article or ware, not specially provided for, in chief value of base metal, and duty was imposed thereon at the rate of 22½ per centum ad valorem pursuant to the provisions of paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

Plaintiff, by its protest, claims that the importation should be classified either as a machine or as a part of a machine in paragraph 372 of said act (19 U. S. C. § 1001, par. 372), as modified by the Torquay Protocol to the General Agreement

on Tariffs and Trade (86 Treas. Dec. 121, T. D. 52739), and dutiable accordingly at the rate of 13¾ per centum ad valorem.

The controversial statutory provisions are here set forth—

[397] Articles or wares not specially provided for, whether partly or wholly manufactured:

    \*     \*     \*     \*     \*     \*

    Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

    \*     \*     \*     \*     \*     \*     \*

        Other (except slide fasteners and parts thereof)___    22½% ad val.

[372] Machines, finished or unfinished, not specially provided for:

    \*     \*     \*     \*     \*     \*     \*

    Other \* \* \*_____    13¾% ad val.

[372] Parts, not specially provided for, wholly or in chief value of metal or porcelain, of any article provided for in any item 372 in this Part:

    \*     \*     \*     \*     \*     \*     \*

    Other_____ The rate for the article of which they are parts

The only witness in the case, Philip Kronowitt, testified on behalf of the plaintiff. He was eminently qualified to testify as to the composition, character, operation, and function of the imported article. He stated he was familiar with the item in controversy, described on the invoice as "Diaphragm-Valves," having "directed the ordering, the purchasing, and the installation of this piece of equipment," and that it is composed of steel and rubber, the steel predominating.

By reference to a diagram, depicting the control system of the heating of a chemical reaction vessel in plaintiff's plant at Toms River, N. J., which was received in evidence as exhibit 1, Kronowitt described in detail how the diaphragm valve in controversy operates. To quote the witness:

\* \* \* On the first sheet of this drawing there is a system described diagrammatically consisting on the left-hand side the piece of equipment marked reaction kettle. Underneath it's a circulating pump, on the top left-hand side the temperature controller, and the center main portion the diaphragm valve imported. On the top right-hand side another circulating pump, and on the bottom right-hand side a boiler. The connecting pipe lines are marked in red and green colors. The diaphragm valve described in the center consists of a cylindrical steel body which has four flanged port openings. In this body is a hollow piston. The hollow piston is moving up and down. This piston has port openings which when moved in various positions vertically will connect this four openings in the body in different ways. The piston itself is activated by a diaphragm on the top of this valve which is in a steel casing. There is a rubber diaphragm and the piston is held in position on the top with a spring. And as you admit air pressure to the top the variation in the air pressure will move the piston down or up. The air is admitted to this diaphragm through a temperature controller which is on the top left-hand side of this picture. This temperature controller has a bulb in the reaction kettle and as the vapors in that bulb expand it activates the temperature controller, which in turn admits air to the diaphragm, or when it contracts it releases air from the diaphragm. Thereby this piston in the cylinder moves up or down. Now, on the bottom of the reaction kettle there is a pump which through this diaphragm valve and pipe lines is connected through an apparatus marked on the right-hand side of this drawing as "boiler." In this boiler a special heating liquid is heated up to high temperature and circulated through the diaphragm through the jacket of this reaction kettle and permits, depending on the position of the port openings, either full heating, which means that you circulate the hot liquid from the boiler through the jacket and back to the boiler, or in the other position it will permit no circulation from the boiler, just circulate

the liquid from the jacket of the reaction kettle back through the jacket again, it will be permitting it cooling down. * * *

With reference to exhibit 1, Kronowitt encircled the diaphragm valve, which is an integral part of the control system, with pencil and marked it "A." He testified that the red and green lines on exhibit 1 show the connecting pipe lines; that the valve consists of a cylindrical steel body with four openings; that it has a hollow piston which moves up and down. The heating liquid from the boiler circulates through the diaphragm valve when the openings are in proper position, passing from the boiler to the jacket to the reaction kettle. In another position of the piston, the circulation from the boiler is cut off, and the liquid which has become cool is circulated from the reaction kettle back to the boiler to be heated again. "It's a continuous circulation, and the circulation is regulated by the diaphragm valve."

The witness stated that the part marked "diaphragm" on exhibit 1 is rubber in the form of a rubber disk; that the air is admitted to the diaphragm through the "temperature controller," shown at the top left-hand side of exhibit 1; that this controller has a bulb in the reaction kettle and, as the vapors in that bulb expand, it activates the temperature controller which, in turn, admits air to the diaphragm, and when the bulb contracts it releases air from the diaphragm. In this operation, the piston in the cylinder moves up and down.

Many years ago, our appellate court gave expression to the general definition of a machine as being a mechanical contrivance for utilizing, applying, or modifying energy or force or for the transmission of motion. *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537. That definition, with appropriate qualifications, has been adopted, applied, and followed in numerous cases. One of them which applies with special importance here is the case of *United States* v. *L. Oppleman, Inc.*, 25 C. C. P. A. (Customs) 168, T. D. 49271. The subject merchandise there under consideration consisted of aneroid barometers, and, in reaching the conclusion that such articles were properly classifiable as machines, the court made the following observation:

The aneroid barometers here involved operate in accordance with mechanical principles. That they are mechanical contrivances, having operating movable parts, such as springs, hairsprings, levers, chains, and diaphragms, without which parts and their coordinate movements the articles would not function, cannot be seriously questioned. * * *

In that case, the diaphragm which formed part of a barometer was activated by air pressure, creating motion which was transmitted to a spring and thence to a lever which caused a needle to move on the face of a dial to indicate the rise or fall of air pressure.

In our opinion, the principles announced in that case compel a like conclusion as to the diaphragm valve here in controversy. See also *Ruths Steam Storage Co., Inc.* v. *United States*, 64 Treas. Dec. 106, T. D. 46550, and *American Locomotive Co.* v. *United States*, 65 Treas. Dec. 1298, Abstract 27009.

In the case at bar, the variation of the air pressure applied to the rubber diaphragm at the top of the valve causes the piston, which is attached to a spring, to move up and down in a steel cylinder containing openings through which the flow of a heating liquid is regulated from the boiler to the reaction kettle, or from the reaction kettle back to the boiler.

It would seem, therefore, that the diaphragm, spring, piston, and cylinder, which go to make up the diaphragm valve in controversy, function in such a manner as to constitute a mechanical contrivance. Further, it appears that by the application of air pressure to the diaphragm said pressure is utilized by the valve in regulating the flow of heating liquid from the boiler.

We are, consequently, of the opinion that the diaphragm valve comes within the definition of a machine, as construed in the *Simon, Buhler* case, *supra*.

Concluding as we do that the imported valve is, in itself, a machine within the purview of paragraph 372, as modified, *supra*, it is unnecessary for us to consider whether or not it also is a part of another machine.

Upon the record before us, we sustain the claim of plaintiff that the diaphragm valve in issue should properly have been classified as a machine within the purview of paragraph 372, as modified, *supra*, and subjected to duty at the rate of 13¾ per centum ad valorem. All other claims are overruled.

Judgment will issue accordingly.